# Foster Cook's Heirs and Creditors, Appellants, *v.* W. R. Bay.

A final decree is one which makes an end of the case and decides the whole matter in controversy; and determines the costs, and leaves nothing further for the court to act on.

The chancellor has the power at any time before a final decree to alter any interlocutory order in the cause.

The chancellor may withdraw an issue directed out of chancery, and determine the whole cause himself.

APPEAL from chancery.

The bill in this cause was filed in the court below against the defendant as the administrator of Foster Cook, deceased, to set aside several sales made by him, and others, of the property of his intestate, on the ground of fraud, and to compel him to restore the property which he had purchased at such sales, and for an account.   It is not necessary for the purposes of the present inquiry to notice any of the proceedings in the cause prior to the decree which was made by the chancellor on the 30th day of July, 1830. The decree then rendered, vacated the several sales mentioned in the bill, and after appointing a receiver, ordered the defendant to deliver to him the property he had purchased at such sales, and then appointed commissioners to take an account, and also directed an issue of *quantum damnificatus* to the circuit court of Warren county.   On the 1st day of July, 1836, the commissioners made their report.   The counsel for Bay excepted to the report of the commissioners.   At the January term following, the exceptions were overruled and the report confirmed.   On the 3d of July, 1837, Bay moved the chancellor for a re-hearing of his exceptions to the report of the commissioners, and also to set aside the order directing an issue of *quantum damnificatus* to the circuit court, and for a final decision of all the matters in this suit.   The motion was predicated upon a petition which stated the reasons of the application.   This motion was sustained, the issue was

withdrawn, and decided by the chancellor, who also sustained the first, second, third, fourth, fifth, sixth and seventh exceptions to the report, by which Bay was ordered to be credited with the sum of $3,859 93, and also that the complainants were entitled to no damages, &c.

The foregoing abstract by Judge Trotter, states sufficiently the only question upon which the cause was decided.

Hughes, for appellants.

The ground of complaint is, that the chancellor near ten years after a decree final in the matters set aside had been rendered, without a bill of review, or petition for re-hearing, according to the rules of the court, upon mere motion, without petition supported by affidavit, and without any testimony, set aside portions of the decree signed and filed by the previous chancellor. Now was this authorised by the rules governing a court of equity? We say, it was not, and we will proceed to show it.

The first inquiry involved in the discussion, is

What is a final decree?

A final decree is such a decree as settles and adjudicates the questions in a cause; and a decree may be final as to part of the matters in litigation, and interlocutory as to the others. See Taylor *v.* Read, 4 Paige's Rep. 567; Royallsaum *v.* Johnson, 1 Randolph, 421; Harvey *v.* Branner, 1 Leigh, 108; Hendricks *v.* Robinson *et als.* 2 John. Chan. Rep. 283, 484.

But it is not necessary to prove that this decree was *final,* in order to place it beyond the control of the court; in order to this, it is only necessary that the decree should be on the merits. The counsel on the other side, perhaps, may rely on some of the cases from Virginia, to show what is meant by a final decree. Those cases, upon an examination of them, will be found to be cases where an appeal had been taken, and the question was not as to the effect of the decrees, but whether any part of the causes were yet under the control of the chancellor, so as to ascertain whether an appeal could be taken, the law being that an appeal could only be taken from a final decree, and so of the cases from Kentucky.

The decree in the court below in its terms was final as to all matters decided by it, the chancellor upon all the questions made

by it decides the law, and then, in conclusion, *reserves all other matters*—What other matters?—other matters not decided by the chancellor.

What then is the effect of this decree? Can it be set aside in whole or in part in any manner? And if it can, in what manner? And when?

In the case of Hendricks *v.* Robinson *et als.* 2 John. Chan. Rep. before referred to, a motion for an account, in particulars which would change the nature of the relief given by the decree previously rendered—by a reference to the same case, at page 283, 316, the nature of the decree will be seen. The chancellor says, "I shall accordingly decree that the several conveyances of real estate from Abraham and John Franklin to Henry Franklin, as stated in the pleadings, and made in the months of February and March, 1808, be declared fraudulent and void: *and I shall reserve the question of costs, and all further questions,* until the defendant shall have had an opportunity of applying, if he shall so elect, for a reference, to a master, to take and state, upon the principles of this opinion, the accounts of Minturn and Champlin, and Jacob and Thomas Walden, as assignees of the vessels and cargoes in the pleadings mentioned." 2 John. Chan. Rep. 316.

Upon the motion, the chancellor says, "The relief sought cannot be obtained upon this motion. There must, at least, be a re-hearing. The application goes to change, essentially, the nature and extent of relief; and the reference called for cannot be considered as a mere omission in the decree, to be supplied as of course." Page 484, 485.

In the case of Charman *v.* Charman, a motion was made on the part of the defendant, to open the enrollment of the decree formerly pronounced, and to stay all further proceedings under the decree. But the chancellor said, "That it was admitted on both sides, that the *merits of the case* had been fully gone into at the Rolls, and that although it was true, that at law a judgment by default might be set aside, yet there was no instance, where a judgment had been set aside on motion, where the merits had been gone into;" and the motion was refused. 16 Vesey, Jr., 113.

The case just referred to, was where a bill had been filed for an

account, and an account decreed, and of course a reference to a master to take the account.   See the same case reported in 14 Vesey, 580.

In the case of Radley & others *v.* Shaw & others, the chancellor says, "A regular decree on the merits cannot be set aside on motion.   The case in 1 Vesey, Jr., 93, is to this point; and there is no irregularity in this case charged on one side, but what is denied on the other.   Nothing appears but the grossest neglect of duty, by the defendants' solicitor, and a regular, but most indulgent conduct on the part of the solicitor for the plaintiffs.   The examination of witnesses after publication had passed, was at the instance, and with the consent of the defendants' solicitor, and as a special indulgence to him.   From the case of Floyd *v.* Nangle, 3 Atkins, 568, it seems that the course to set aside a decree, for surprise, and irregularity, is by petition; *but here is no irregularity to be admitted;* for every act complained of, and proved, was by consent and solicitation of the defendant's solicitor, and he is concluded from setting it up as irregular.   It would appear that the defendant has been almost deserted by the person to whom he entrusted his defence, and that the merits of this case ought to be looked into; but this is not the mode.   I should apprehend that a petition for a re-hearing would be the proper course, but upon this I do not pretend to decide.   It is sufficient that this is a decree regularly obtained, but not yet perfected, and that it is not to be discharged on motion."   1 John. Chan. Rep. 200–1.

In the case of Bennett *v.* Winter & Rankins, a petition was presented, sworn to, to have the final decree which had been pronounced corrected, by adding to it supplementary provisions.

The chancellor.—"A final decree, regularly obtained and enrolled, cannot be opened or altered in this court, but upon a bill of review; and, *if not enrolled,* it can only be corrected upon a re-hearing, duly applied for under the rules of this court."   2 John. Ch. Rep. 205.   See also 1 Vesey, Jr. 92.

In the case of Craig & Edmonston *v.* Buchanan and others, the supreme court of Tennessee recognise the rule that a final decree cannot be set aside at a term subsequent to that at which the decree is pronounced, but an interlocutory decree may; but this must be done upon petition for re-hearing.   See 1 Yerger, 141.

The rules of the court of chancery which were in force when the proceedings complained of were had, are in Part　, Rule 27, in page 17 of the rules:

" That every final decree of this court shall be made up and engrossed by the clerk, to be signed by the chancellor, at any time after thirty days of the pronouncing the same, if required by either of the parties, unless the same be appealed from, or a *re-hearing* be petitioned for *before it be made up.*"

Rule 28 :—" That every petition for a re-hearing shall contain the special matter or cause on which such re-hearing is applied for, be signed by two counsel, and the facts therein stated, if not appearing from the proceedings in this court, shall be verified by the oath of the party, or some other person; and no petition for a re-hearing shall be deemed too late until the decree is actually engrossed and signed by the chancellor and filed."

Rule 50, page 20 :—" That final decrees may be signed by the court at any time during the term at which the same were pronounced," &c.

By the statute law it is provided, that an appeal may be taken from an interlocutory order or decree.　See Revised Code, 93—4, section 37.

This review of the law and the adjudications is made so that we may be enabled to apply the principles to be extracted from them to this case.　From them, on the part of the complainants, we come to the conclusion that a decretal order, a final decree, or a decree in its nature final, can in no instance be set aside, altered, or changed, but in one of these modes.

1st.　By petition for re-hearing before enrolment.

2d.　By bill of review after enrolment.　And

3d.　By appeal to an appellate court.

These positions are all sustained by the English and American authorities, where a greater latitude is given them by the rules of practice in our courts of chancery.　By our practice, as fixed by our rules before referred to, a petition for re-hearing cannot be presented unless it be presented before decree, signed, and filed. In England, the petition could be presented at any time before enrolment.　Some cases have occurred of a re-hearing upon petition at any time within twenty years.

[F. Cook's Heirs and Creditors, Appellants, *v.* W. R. Bay.]

In the case under consideration, that which was done does not come within any of the rules laid down. Upon motion, as to a part of the matters attempted to be corrected, and as to others upon motion supported by petition without being sworn to, the chancellor, ten years after the rendition of the original decree, ordered that portions of the decree should be set aside and annulled. This we think, to say the least of it, is a novel *proceeding*. The petition presented does not even purport to be a petition for a re-hearing. In what book an authority can be found, I do not know. I have looked for one without success, and I conclude that no such authority can be found. Should it be contended on the other side, that the decree first rendered was not in all respects a technical, final decree, and that therefore the whole cause was under the control of the chancellor, we answer, that the case referred to in 1st Vesey, p. 93, that even a decretal order cannot be set aside, and the reason of all this is given in a few words by the chancellor. "I might as well take upon me to alter any other part of the record," —so in the case under consideration, the parts of the decree altered, varied and changed, was an alteration of what by the practice of the court had become a record. In the court of chancery of England and of New York, by enrollment the decree becomes a record. In our courts it is the signing and filing the decree which makes it a record, and from thenceforward the practice on the subject as applicable to enrolled decrees, applies. This is apparent. In the one case the rule is, that you shall not petition for a re-hearing after enrollment; and in the other, you shall not petition after the signing and filing of the decree; in the one case a record is made by one thing, and in the other by another, and in both the record cannot be altered but by a bill of review. We think we have made it manifest, that the chancellor erred in altering the decree, and that the decree should be reversed. What is the result? The case must be returned to the chancery court, until the issue of fact is tried in Warren.

Holt, for appellees.

The errors complained of in the proceedings and decree in this case, will be noticed in the order in which they have been assigned.

"1. The court erred in setting aside that part of the interlocutory

decree, which directed an issue to be tried in Warren county, and the issue made up under said. decree, and in setting aside the interlocutory decree in other respects."

If it be designed by the first branch of this assignment, to contest the right and power of the chancellor to set aside an issue once directed, and which remains untried, the question is easily disposed of. An interlocutory decree (this decree is interlocutory in all its features. It is merely directory to the commissioners, as to the rule by which they are to be governed in taking the accounts. It remains inchoate and immature, until the report has been received and finally acted on,) whatever may be its character, rests in the breast of the court, until it has been made final, and can be annulled or modified at the pleasure of the chancellor. To this effect is the case in 1 Bibb, 124–5, where the court of appeals of Kentucky say, "a court of chancery has a right to alter an interlocutory decree, at any time before a final decision thereon, and without being requested by either party."

In Field *et al. v.* Holland *et al.* 6 Cranch, 8, Chief Justice Marshall, lays down the principle contended for, in this explicit language, "a court of equity may ascertain facts themselves, if the evidence enable them to do it, or may refer the question to a jury, or to auditors. After an issue ordered, a court of equity may proceed to a final decree, without trying the issue, or setting aside the order. There was consequently no error either in directing the issue or discharging it." Page 22. The ordering as well as the withdrawal of the issue being wholly a matter within the discretion of the chancellor, even if an error had been committed in the exercise of this discretion, it could not, upon a familiar principle, be reviewed or corrected in this court.

The issue in this case was directed by the interlocutory decree in June, 1830. It was withdrawn in July, 1837, having been pending before the circuit court of Warren county, for more than seven years. During this long period, owing to the *gross laches* of complainants, there was neither a trial of the issue, nor an attempt to try it. The entire fortune of defendant (Bay) was bound up in the controversy, the final settlement of which awaited but a disposition of the issue referred to the Warren circuit court. Longer delay seemed a denial of justice, and as seven years expe-

rience left the chancellor no reasonable hope that the issue would ever be tried by the circuit court, he, in the exercise of a sound discretion, very properly withdrew it. Being withdrawn, and in the language of the record, (page 113) "the complainants not appearing further to prosecute said issue, or to insist that it shall be tried at this bar or elsewhere, the chancellor annulled that portion of the interlocutory decree, which ordered the issue, and took the trial and determination of the same upon himself." This from the authorities cited he had an undoubted right to do, and as the testimony was all on file, and had been so for many years, and there was no suggestion on the part of complainants, that they were not ready, or had other proof to offer than that in paper, the chancellor was entirely competent to the determination of the matters and things involved in the issue which had been directed, and his having done so is no ground of complaint, unless his determination was erroneous upon the law and facts of the case.

The latter branch of the first assignment of errors, impeaches the legality of all the other modifications made in the interlocutory decree. They were made upon petition, filed (page 109—10 and 11,) which petition sets forth distinctly the reasons for each change in the decree which was asked for. These reasons also appear in the decretal order, (page 112—13,) and are fully supported by the proofs, vouchers, and exhibits in the cause. There were but three changes made in the interlocutory decree,—the *first* of which relieved defendant, Bay, from liability for the debts due from H. Downs to F. Cook's estate, and which were lost by the sudden and inevitable insolvency of Downs. (Page 112—13.) With these debts the interlocutory decree of June, 1830, directed Bay to be charged, under an impression that they had been lost by his negligence. The commissioners accordingly in their report, (page 103, &c.) debit Bay with principal and interest of one-half of two judgments in favor of Lane and Armstrong against Cook, Downs, &c. amounting to $1055 47. That the impression of the Chancellor, under which this feature of the decree was framed, was erroneous, is manifest from the exhibits and proofs on file. Because, as is shown by Bay's account of his administration, presented in response to the requirements of the bill, (page 11,) and the accuracy of which has not been contested by complainants, *it*

*having passed the ordeal of the commissioners.* Bay was unable to pay these judgments until April, 1828. (Page 49.) Until this payment had been made, no right of action accrued to him as administrator against Downs, for money paid, laid out and expended for his use. The payment was made at a day too late, for Bay to have instituted suit and recovered judgment at the spring term, 1828, of the Warren circuit court—that court being held on the 2d Monday of April. Acts 1825. Laws of Mississippi, page 73. He was therefore guilty of *no laches* in not suing Downs to that court. Immediately thereafter, Downs became *insolvent*, and suit to the next term, would, as is abundantly proved, have been wholly unavailing; and, indeed, a month *before* the next term, Bay had withdrawn from the office of administrator, and these claims against Downs had been delivered over to the administrator who succeeded him. The bankruptcy of Downs immediately after the right of action had accrued to Bay, (if any ever accrued,) rendered the loss of the claim inevitable, and no vigilance could have saved it.

John M. Henderson, (page 132—3,) who was well acquainted with Downs' condition, gives it as *his impression*, that if a judgment had been obtained against him, at the spring term, 1828, of the Warren circuit court, the money could have been made; but he does not pretend to say, nor does any witness intimate that a judgment against him at the 'fall term, 1828, would have been available: the contrary is the inevitable inference from the testimony. Yet the fall term was the earliest one to which suit could have been brought. But had suit been instituted, it is no where shown by complainants that a judgment could have been obtained either at the spring or fall terms. Downs constantly insisted, that the estate of Foster Cook *was in debt to him ;* this was in proof before the commissioners, and for aught that appears he might have maintained this position before the court, had he been sued. The *onus* is wholly upon complainants. Before Bay can be held responsible to them for the amount of this claim, they must prove that they have been *damnified* by his failure to collect it. To do this, they must make it manifest by testimony, that a judgment could in fact have been had upon the claim. 2d. That such judgment could have been collected of Downs; and 3d. That

Bay's conduct was not in good faith, but was the result of *gross negligence.* Neither of these positions is supported by the evidence.

I deny, however, that an administrator will be held responsible for a debt, merely because he fails to sue upon it, to the first term of the court, after it comes to his hands. An attorney would, under such circumstances, be liable, because claims are given into his hands for suit; but an administrator is bound to manage the estate of his intestate, as a prudent man would manage his own. It may often be the interest of the estate, to forbear suit, to grant indulgence, and thereby secure debts which might otherwise be lost. If the administrator in the exercise of the discretionary authority with which he is invested, should forbear to sue, and the debt should thereby be lost, still he could not be held liable, unless such forbearance was the result of fraud, or of such palpable *laches* as would be evidence of fraud. There is no testimony in the case tending to convict Bay either of fraud or negligence, in reference to this claim against Downs. It is true that George Wyche in his answer, (page 73,) says that he urged Bay to sue on the claim to the fall term, but that Bay answered, Downs was his friend and he could not press him. This is not in a deposition, but in the answer of a co-defendant, 1 Starkie, 288, 289, note 1; and according to a universal principle of evidence, it cannot be received as competent testimony against Bay, who had no opportunity of cross examining Wyche. 12 Vesey, 355. Even this same Wyche, who breathed towards Bay the malignity of a fiend as evidenced by his answer and pamphlet, admits in his answer, (p. 73,) that "in the settlement of the debts, Bay showed no want of integrity, diligence or zeal." And James C. Wilkins in his deposition, (page 158,) says, "that in all Bay's negotiations, he exhibited an honest and honorable intention to pay the debts, and save the estate to the family." Bay was a distributee of the estate, and he had every motive of interest as well as of duty, urging him to protect as far as was practicable, the shattered fortune of his deceased father-in-law.

The next portion of the interlocutory decree set aside, is that which directed Bay to be charged with the amount collected by Wyche, on demands in favor of Cook and Wyche, handed him for

collection, by Bay, and which was subsequently lost by Wyche's insolvency.  The grounds upon which this charge in the interlocutory decree was made, are fully set forth in the petition of Bay, (p. 109—111,) and in the decretal order of the chancellor, (p. 112.) They speak for themselves, and no argument need be made to support them.  It is sufficient to remark, that the administrator of an estate so large and complicated as F. Cook's, must necessarily act through agents, and if they are selected prudently and in good faith, he is not responsible for their breaches of faith or insolvency, which could not be foreseen or provided against, no more than he would be liable for money in the hands of a sheriff, or attorney at law, belonging to the estate, and which might be lost by their bankruptcy.  Wyche was the surviving partner of Cook, had enjoyed his confidence, seemed devoted to his family, and being intimately acquainted with the condition of his estate, was a very proper agent to be trusted in the collection of these partnership debts, which under contract belonged to Cook's estate.  Who would take charge of an estate as administrator, if he were liable for the default of an agency thus judiciously constituted?  The aggregate amount thus improperly charged against Bay, as collections made by Wyche, is $769 45, being claims which Wyche received from B. Cook and Bohannon.  (See Commissioners Report, 103.)

The second assignment is "That the court erred in rendering the final decree, when by said decree it is declared that the complainants had sustained no damage by the improper management of the estate of Foster Cook, by W. R. Bay, the administrator, &c."

It may not be improper to remark, that this issue was improvidently directed, in the first instance—there being no *competent* testimony in the case authorising it.  The counsel of defendant, Bay, to whom he had confided the preparation and argument, was absent when the trial was had at the Chancellor's chamber, at Natchez, in 1830, which resulted in the interlocutory decree, by which this issue was ordered.  It is a remarkable fact, that in the absence of Bay's counsel, *the deposition of one of the complainants,* (B. H. Cook,) was thrust upon the Chancellor, and constituted, in truth, the basis of some of the harshest features of the interlocutory decree.  That deposition, (as his Honor, Judge

Turner, will recollect,) was rejected upon the final hearing. The deponent was violently excited against Bay, and under this feeling and the stimulants of pecuniary interest in the result of the suit, he made strong statements in regard to Bay's having mismanaged and neglected the estate of F. Cook. But the other depositions in the case, it is believed, furnish no pretext for holding him responsible, under the issue of *quantum damnificatus.*

Trustees (and such the Chancellor has construed Bay to be,) *are mere stakeholders.* They cannot be held liable for more than they receive, *without wilful default.* 1 Vesey, 193–4. A trustee is only answerable *for fraud, or for such gross neglect, as is equal to fraud.* 2 Maddox, 143—4. In Thompson *v.* Brown, 4 Johns. C. R. 619, it is held that "trustees, acting with good faith, are treated with liberality and indulgence, and if there is no *wilful misconduct,* or *fraud* on the part of a trustee or executor, *he will not be held responsible for a loss.*" This being the principle which is to regulate Bay's responsibility, I will take a condensed view of the testimony, in order to ascertain if it convicts or even tends to convict him, either of *actual fraud,* or of such *gross neglect* in the management of the estate as will amount to fraud. If it does not so convict him, then the decree of the Chancellor, declaring that no damage had been sustained by complainants, was correct, and the second assignment of errors cannot be sustained.

It is shown by commissioners' report, and has been always admitted by complainants, that Bay fully accounted for all *his actual receipts* while in charge of the estate. His returns exhibit the nett amount of each crop for the years 1827, 1828, and 1829; and the most searching scrutiny of the commissioners, has not detected any error whatever, in the accounts presented by him. It is also admitted by complainants, that the crop for the year 1827, (made by Foster Cook himself,) but which was gathered and sold by Bay, was a *fair crop,* and exhibits the capabilities of the estate. This crop was made by Foster Cook himself, who was *a skilful planter,* (123.) But they insist that Bay should be charged *with all that the crops of* 1828 *and* 1829 *fell short of that of* 1827, and interest on the amount of this deficit. The crop of 1827 yielded 164 bales—that of 1828, yielded but 135

bales, Com. Rep. showing a falling off from that of 1827, of 29 bales. The crop of 1829 yielded but 65 bales, Com. Rep. showing a deficit of 99 bales—which added to the 29 of 1827, exhibits a total deficit of 128 bales, which, with interest, is the damage they insist Cook's estate has sustained from the negligence and mismanagement of Bay. Bay did not have the plantation or negroes in his possession in 1830. The interlocutory decree directing him to surrender them to the Receiver, was made at chambers in February, 1830, and entered in court in June, 1830. The estate was accordingly surrendered.

These deficits are easily accounted for, and in view of the facts disclosed by the record, involve no gross negligence or fraud on the part of Bay.

The estate of Foster Cook was heavily oppressed with debt, and Bay had no resources. Corn was scarce, and he was compelled, in consequence of its high price, and his inability to purchase, (as were some of his neighbors,) to cease ploughing before the crop was made. 142—118. His horses were poor and some of them "worked blind." He being unable from the crippled and embarrassed condition of the estate, to procure provender. This the testimony shows, and from these causes, beyond Bay's control, and for which he cannot be held responsible, the crop of 1828 must have been reduced many bales. 118. Willis Vick says the crop of 1828 "was moderately good." Is such a crop evidence of *wilful neglect ?*

Again, in the fall of 1828, Mrs. Cook had her dower assigned to her, and the allotment as made, embraced *four-fifths* of the cotton crop, (See deposition of *Spann,* 126,) which she held in her possession, *upwards of a month,* (126,) during the best season for picking, (143.) This occasioned much loss of cotton, and the crop was, in consequence, not gathered until late in March, and then not entirely gathered, but Bay was compelled to begin preparations for a new crop. (See *Higgins'* deposition.) This was the result of the action of the courts of the country, for which Bay certainly cannot be held liable. The possession, by the widow, for upwards of a month of *four-fifths* of the crop, in the midst of the picking season, added to the impoverished and almost

[F. Cook's Heirs and Creditors, Appellants, *v.* W. R. Bay.]

starving condition of the work-horses, &c., will satisfactorily account for the deficit of 29 bales in the crop of 1828.

The deficit of 99 bales in the crop of 1829, may also be accounted for, without imputing fraud or gross neglect to *Bay*. *Upwards of one-third* of the cleared land in cultivation in 1827, was in the spring of 1829, assigned to Mrs. Cook for her dower, which she has ever since continued to occupy. This, of itself, would reduce the crop 55 bales, and leave but 44 to be accounted for. (See *Allen Sharkey's* deposition, 118, 120.)    Of the two hundred acres left to Bay, by this allotment, eighty acres were worn *out and not good for more than half a crop.* (See *Spann's* deposition.) This would produce a further reduction in the crop, of probably 20 bales. Again, all the negro houses had been included in the allotment of dower to the widow, and Bay was compelled to give her land for the use of the houses during the year, involving a reduction in the crop of a number of bales more, say 10 bales. This would leave a deficit of but 14 bales unaccounted for. The contingencies of the crop, under the best management, and the fact that Bay was harrassed and hunted down by complainants, with law-suits and every species of persecution and annoyance, will, without any suspicion of fraud, or gross neglect, satisfactorily exhibit the reasons why the crop of 1829, yielded but 65 bales.

Bay had no motive to neglect the crop in 1828 or 1829, for as the agent of Fisk, he had in the summer of 1828, purchased in the estate, and was then holding and cultivating it for Fisk, in the hope of re-imbursing himself out of its proceeds, as soon as Fisk's claims should be satisfied. It was his interest, to make the estate as productive as possible, and he no doubt did so.

The testimony offered by complainants to establish negligence and mismanagement on the part of Bay, is of a very flimsy and unsatisfactory character. It consists of the deposition of one witness, (*Willis Vick,*) who thought the farm, "viewed from the road" (as he rode past, I suppose,) "did not seem to have been well cultivated." Of another, (*Allen Sharkey,*) who, *from looking at the farm in* 1829, *did not think it had been skilfully cultivated the year preceding.* Of another, (*Wrenn,*) who saw *two piles of cotton lying in the field,* and stock occasionally in it. (See

this explained by *Higgins*, 144, 145.)   Of another, (*Brown*,) who saw the hands of the Cook plantation, working on that of Dr. Bay, &c. &c.   But the same witnesses who saw the hands of Cook's estate, at work on Bay's place, also saw Bay's hands at work on the Cook place.   The plantations were near together, and there was, no doubt, occasional exchange of work, alike beneficial to both.   As to a waste of cotton, stock breaking in, &c., these *glimpses* of other witnesses from the road, are so fully explained by Higgins, in his deposition, that I need but refer to it.   As Brown was the bitter enemy of Bay, (having in consequence of his cruelty, been discharged by him,) and also the enemy of Higgins, who succeeded him as overseer, and as several of the other witnesses obviously labored under the strongest excitement against Bay, it is remarkable that they have not made out a stronger story against him.   Bay, was at the time, as shown by the virulent pleadings in this case, and the still more virulent pamphlets on file, assailed in the most violent manner, in consequence of his connection with the estate.   He was watched with jealousy, and his every act and word was marked and reported by the tongue of slander.   Yet with all these circumstances to color it, the testimony against him, upon this point, is but a budget of conjectures, and facts, glanced at, rather than seen, or closely examined, which are entirely consistent with the bearing of a man of honor and a faithful trustee.   Bay was no planter, but a physician by profession.   He may have lacked *skill*, but not honesty,—it is for *wilful* default, not unskilfullness, that he is to be held liable.

The third and last assignment of errors is "that the court erred in the orders sustaining exceptions to the report of the commissioners, and the orders making additions on one side, and deductions on the other, to the items in the account reported by the commissioners."

"The additions on the one side and deductions on the other," were the necessary result of sustaining the exceptions to the report.   If these exceptions were well taken, the additions and deductions were of course properly made.   Very few of the exceptions were contested by complainants before the chancellor; the

facts upon which they rest being fully disclosed by the proof and exhibits in the case, were not controverted at all.

In regard to the first exception, it is confidently insisted that the estimate of $600, fixed by three disinterested appraisers, is a better criterion of the negro Tom's value, than the opinion of a witness nine years after, which opinion must necessarily be influenced by the high price of slaves in 1836, (when the witness spoke) compared to their price in 1827. The sale of the sheriff was openly and publicly made, and the negro sold but for $530, and was purchased under a fair competition in bidding by a stranger, (Newman.) Even if the appraised value of $600, instead of that of $530, indicated by the sheriff's sale, be the standard by which Bay is to be charged, it will still be a dead loss to him of $70 and interest. I believe Bay should have been held liable but for $530 and interest, not even for the appraised value, much less for $650 and interest, because nine years after the sale a single witness was found who expressed the opinion to the commissioners, that Tom was worth $650. Spann (125) says the appraisement (13) presents a true estimate of the value of the property. Tom was appraised to $600. Spann was one of the appraisers.

The second exception was disposed of by our examination into the propriety of the change made in the interlocutory decree, by which Bay was relieved from responsibility for one half of Lane & Armstrong's judgment, against Cook & Downs. The same reasons which justified the correction of the interlocutory decree in this particular, must sustain the exception to the report.

The third exception questions the propriety of the report in charging Bay with the draft of Downs for $400, on Cook and Wyche. This exception was before the chancellor, unhesitatingly admitted by complainants' counsel, to be well taken. There being in the first place, no evidence of the drafts having been accepted, and even if accepted and paid (which might be inferred from its being found among the papers of Cook & Wyche) yet the presumption of law is, that Cook & Wyche had funds of Downs in their hands, out of which the payment was made, and of course the payment would give them no right of action against Downs. No evidence is reported, and none was ever offered before the

commissioners, to repel this legal presumption. They charged Bay, simply because the draft had been found among the papers of Cook & Wyche. The draft is on file, and accompanies the report, and must of itself sustain this exception. It was returned by Bay to administrator *ad colligendum.* See his receipt, Exhibit H.

The *fourth exception* has in effect been already examined. I showed that the interlocutory decree was properly set aside, so far as it directed Bay to be charged with debts collected by Wyche as his agent, of B. H. Cook and Bohannon, and which were subsequently lost by Wyche's insolvency. This exception involves precisely the same matter.

*Fifth exception.*—Bay should not have been charged by the commissioners, according to their own report, with the $100 due from Higgins on his draft on Buck, because Higgins was always insolvent, and at the time Bay surrendered the administration (as reported by commissioners) nothing was due from him to Higgins, and of course he could not have made this debt out of him. He was working for Bay at $50 per month, to be paid in negroes, and had worked but three months (from middle of June to September) when Bay gave up the estate, this claim among the rest, to the administrator *ad colligendum.*

*Sixth exception.*—The amount charged against Bay by commissioners for seven horses and a yoke of oxen ($341 22) being added to the appraised value of the property sold, under the Longacre execution, cannot be allowed, because made under a mistake of fact. They were not a part of the property sold under the Longacre execution, as the commissioners suppose.—The return of the sheriff shows this. They were sold under the Wilkins execution, as proved by the sheriff who made that sale; and Bay, as the receiver's receipt makes manifest, returned them, (except such as had died,) as directed in the interlocutory decree. The appraised value of the property sold under the Longacre execution was $1118. With this amount and interest Bay was charged by the chancellor, in his final decree, and against this charge Bay makes now no objection. The commissioners (108–9) refused to estimate the property at the sum .for which it was sold by the sheriff, being far less than its

[F. Cook's Heirs and Creditors, Appellants, *v.* W. R. Bay.]

appraised value, but profess to charge Bay with the appraised value, which, as shown by exhibit F, was but $1118; whereas they have charged $1459 99, the difference being made up by mistake, in setting down other property, as sold under this execution. But to this $1118 the commissioners added $341 99, for horses, &c. (as is supposed) making the aggregate of $1459 99, with which they have debited Bay, for "value of property sold under the Longacre execution." I think the chancellor *acted* in conformity with the proofs and vouchers in the case, when he sustained the exception as to the $341 99, and charged Bay with but the appraised value of the property sold under the execution, ($1118,) with interest upon it. Even this is holding him to a most rigid responsibility, and inflicting much loss.

*Seventh exception.*—I believe it is a well settled principle, that executors, administrators, and trustees, generally, should be allowed all reasonable expenses connected with a discharge of their duties; and among these expenditures there is none more promptly allowed by court than counsel fees. There is no disbursement more necessary and proper. There never was an estate whose involved and complicated condition required a more constant resort, on the part of the administrator, to the aid of counsel than Foster Cook's. The small sum of $180, paid to Messrs. Sharkey . Guion for their professional services, should have been allowed by the commissioners. It was, however, rejected. *Vide* Minutes of Commissioners.

The *eighth* exception was not sustained, and is not the subject of examination, under the assignment of errors. Should the court concur with defendant's counsel, upon the main principle, that the issue of *quantum damnificatus* was properly withdrawn, and correctly decided upon by the chancellor, any small sums which have been the subject of discussion under the exceptions to the report, and the motion to correct the interlocutory decree, if not fully sustained by the proofs and vouchers, can be deducted from the amount of the decree in favor of Bay, and a decree entered here for the sum actually due. The strongest conviction, however, is felt, that the decree is sustained *in all things, great* and *small*, by the pleadings, and proofs in the cause. A searching examination of weeks, was given to the contents of the voluminous re-

cord now presented, by the chancellor, before the final decree was pronounced; and I think, that the more thorough and patient the investigation, the more manifest will be the justice of the decree.

The mass of the record relates to matters not now contested between the parties. The great clamor of complainants was, that the sales made of the estate by the trustee and sheriffs, should be set aside. This was done, and no one acquiesces in it more cheerfully than Bay. It was his honest purpose from the outset, not to speculate, but to save the estate, if possible, from total sacrifice, for the family of F. Cook. This has been done; and the ground of controversy is now shifted to the question, whether he shall be re-imbursed for his advances and labors, or whether the heirs of the estate shall enjoy the fruits of both, without making remuneration.

Mr. Justice Trotter delivered the opinion of the court.

The errors assigned are, 1st. That the court erred in granting a re-hearing of the exceptions to the report at a term subsequent to that at which they were overruled.

2. In sustaining the exceptions.

3. In withdrawing the issue which had been directed to the country at the first hearing.

The weight of the argument of the counsel for the appellants is based upon the consideration that the decree rendered by the chancellor in 1830, was final and conclusive between the parties, and hence that it was error to set aside any part of the same at a subsequent term, unless it had been done by a bill of review prosecuted according to the established rules of the chancery court. I will therefore proceed to the examination of the question, whether the decree of 1830 is final, for I concur with the counsel that this is really the main subject of inquiry. A final decree is one which makes an end of the case and decides the whole matter in controversy, costs and all, leaving nothing further for the court to do. If the decree which was rendered in 1830, be tested by this rule, it seems to me to be difficult to conceive how it can be called final. It did not profess to be final, nor could it have been so considered by the chancellor. It did no more than to vacate certain sales of the property of Cook, to appoint a receiver to

whom the property which had passed by the sales so vacated should be delivered. It then ordered an account to be taken and stated by commissioners, and detailed the principles by which the commissioners were to be governed in taking the same. It also directed an issue to ascertain whether any, and what damages Cook's estate had sustained by the mismanagement charged in the bill, and reserves the question of *costs* and *all other questions* in the mean time, that is until the coming in of the report, and the return of the verdict on the issue which was sent down to the country for trial. Can this decree be said to make an end of this case, and to decide the whole matter in dispute? Was it ready for endorsement? The chancellor wanted the materials for a final decree. He took the steps necessary to procure them. Until they were furnished, he could do no more than make the interlocutory orders which he did. He arrived at the principles upon which a final decree could be rendered, but he was not yet in possession of the facts necessary to enable him to make it. In his opinion, the estate of Cook had sustained damages by the mismanagement of the administrator, but as the quantity of damages was not satisfactorily shown, he referred that question to a jury, as he had a right to do. It was precisely similar to an interlocutory judgment at law, and the award of a writ of inquiry to ascertain the damages. I have examined the cases cited by the counsel for the appellants, and none of them do in my opinion sustain the argument that this is a final decree. On the contrary, it may be safely stated as a rule deducible from all the cases on this subject, that a bill of review is only required after an enrolment of the decree, when it is made final, and that an interlocutory decree, whatever may be its character, rests in the breast of the court until it has been made final. These distinctions are fully taken in the case of Harvey *et ux. v.* Branson, 1 Leigh, 118. In that case a commissioner had been appointed to sell the land decreed to complainants, who was to report to the court, &c. The rights of all the parties, however, were fully and finally settled, and costs decreed. The appointment of the commissioner was merely to *execute* the decree, precisely as in the case of a sale under a decree to foreclose a mortgage. But that is very different from the present case, where commissioners were appointed to enable the court to ob-

tain possession of the whole case.   The issue was directed for the same purpose.   This was then unquestionably an interlocutory decree, and consequently open to re-examination by a petition for that purpose.   In the case of Calk *v.* Stribling, 1 Bibb, 124; the court of appeals of Kentucky lay it down as a well established rule, that a court of chancery has a right to alter an interlocutory decree at any time before a final decision thereon, and without being requested by either party.   This opinion is confirmed by Chief Justice Marshall, in the case of Field *v.* Holland, who observes, a court of equity may ascertain facts themselves, if the evidence enable them to do it, or may refer the question to a jury, or to auditors, and that after an issue ordered, the court may proceed to a final decision, without trying the issue, or even setting aside the order.   The court in this case referred some of the questions in issue, to a jury, and others to auditors.   These are matters resting in the sound discretion of the chancellor, and we are not at liberty to say that he erred.   The issue had been in the circuit court for nearly seven years, and was not then tried, and there appeared to be no disposition to bring it to trial.   The chancellor could only remedy this delay by proceeding to try the question himself, as he did, and as he had an undoubted right to do.   If I am correct in holding the decree of 1830 to be only interlocutory, the 1st error assigned is not well taken, and the chancellor had it completely within his power at any time before final decree, to alter any order he had made.   The decree was entirely under his control, and the request or motion of neither party was necessary.

In this case I am satisfied from a very careful examination of the evidence, that there is no error in the allowance of the exceptions taken to the report of the commissioners.   The counsel have waived the particular examination of the several exceptions, considering that the assignment of error predicated on the decision of the chancellor, by which they were sustained, depended mainly upon the question whether the decree was final or interlocutory. The reasons given by the chancellor in support of his decree are fully warranted by the proofs in the cause, and it is not deemed necessary to bring forward the testimony in the opinion.   It is upon the record, and is clear and convincing.   Let the decree be affirmed.